McDOWELL MFG. CO. et al. v. ELECTRIC WATER STERILIZER CO. et al.

(Circuit Court of Appeals, Third Circuit.    December 27, 1918.)

No. 2381.

PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.
　　Patents Nos. 943,188, 951,311, 951,312, 951,313, relating to methods and apparatus for the electrolytic purification of water, *held* not infringed by defendants' device.

Appeal from the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Bill by the McDowell Manufacturing Company and the Electric Water Purifying Machine Company against the Electric Water Sterilizer Company and another. From the decree, complainants appeal. Affirmed.

Frederick W. Winter, of Pittsburgh, Pa., for appellants.

David P. Wolhaupter, of Washington, D. C. (E. C. Higbee, of Uniontown, Pa., of counsel), for appellees.

Before BUFFINGTON and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge.    This action is double in character. By their bill, the plaintiffs first charge infringement of five patents granted the McDowell Manufacturing Company as assignee of Harry B. Hartman, one of the defendants, and then assert a right to an assignment of four patents granted Hartman, all relating to methods and apparatus for the electrolytic purification of water.    The validity of the patents in suit granted on the assignment of Hartman, the defendant inventor, was, of course, not attacked at the trial, but infringement was denied, the plaintiffs' right to an assignment of patents granted Hartman and held by him was traversed, and a counter-claim by Hartman to an equitable title in the patents in suit was set up.    At the trial, one of the patents in suit was withdrawn.    By the decree which followed, the trial court held the remaining patents were not infringed, denied Hartman's counter-claim to an equitable title in them, and dismissed the plaintiffs' demand for an assignment of Hartman's patents.    Out of these diverse findings, the one matter submitted for review on this appeal is the issue of infringement. A discussion of this issue together with the reasoning and findings of the trial court—with which in the main we agree—appears in the unreported opinion of Judge Thomson, of which we shall avail ourselves for an ample statement and discussion of the issues involved and decided:

　　"The bill in this case charges the defendants with infringement of five Hartman patents, involving the electrical purification of water, namely, Nos. 943,187, 943,188, 951,311, 951,312 and 951,313.    *    *    *
　　"There are four patents to be considered, patent No. 943,187, sued upon, having been withdrawn at the trial.    There is no direct attack on the validity of the patents in suit, and hence the question involved is one of infringement, or, in other words, the scope of the claims relied upon and the application of

those claims to the defendant's device. The subject in controversy is the purification of water by the action of electricity. This is effected by passing the water under its supply pressure between metal plates called 'electrodes' placed a short distance apart in a box known as an 'electrolyzer,' and connected to an electric circuit. The electric current passes through the water from the positive plate or 'cathode' to the negative plate or 'anode,' the water at the same time passing between the electrodes. The plates are usually iron or aluminum. The action of the electric current produces a certain amount of gas containing oxygen or ozone. It also produces salts from the plates, which are converted by the impure water into a coagulant material, and this material entrains the impurities and bacteria in the water, which may then be filtered out. The water passes from the electrolyzer into another chamber of such size as to decrease the velocity of the flow, there to be acted upon by the salts or gases. It then passes to a filter or filters, where the impurities are caught in a layer of coagulant which forms on the top of the filter-bed, and the clear water is drawn off at the bottom. To economize in the electricity used, the flow of the current is started and stopped with the starting and stopping of the flow of water through the apparatus.

"The general subject of electric purification of water is old in the art. This is conceded by the plaintiffs. The patents in suit are for methods and apparatus, which are improvements on this general subject-matter, and involve two features of novelty over the prior art: First, the reversal of the electric current through the electrolyzer periodically, so that substantially equal quantities of current are caused to flow in opposite directions between reversals, notwithstanding interruptions in liquid and current flow. The purpose of this periodical reversal of current is to keep the plates clean; that is, to prevent the formation of deposits by well-known electric action upon the electrode plates to such an extent as to prevent the salts from being thrown off the plates, and their efficiency reduced. This feature is involved in patent No. 943,188. The other novel feature consists in making and breaking the electric current with the starting and stopping of the flow of water, and in a manner to maintain the current flow appreciably longer than the liquid flow; the purpose being to insure the electric treatment of all water passing through the apparatus. This feature is involved in patents 951,311–951,313. Patent 951,311 covers the method of water purifying, including the particular step of maintaining the electric current after the flow of the water has ceased. Patent No. 951,312 is on the mechanical feature of the valve connection used for maintaining the flow of the electric current after the liquid flow has ceased; while patent No. 951,313 is for the combination of parts used for practicing the method of patent 951,311, comprising as one of its elements a valve similar to that of patent 951,312. The object in each case is to maintain the electric current somewhat longer than the flow of the liquid.

"The defendants, in answer to the charge of infringement, allege, first, that defendants' apparatus contains an entirely new organization of parts involving different processes of purification of water, from that carried out by the organization of parts provided for in the patents in suit; and second, that the state of the art prior to the application for the patents in suit requires such a limited construction of those patents as to exclude from the claims thereof the apparatus of the defendants. That otherwise, the state of the art would be anticipatory of such patents and invalidate the same.

"The structure and arrangement of defendants' apparatus, and its method of operation, have been stipulated in Plaintiffs' Exhibit No. 5. Inasmuch as this apparatus is manufactured in accordance with, and under the protection of, patents of the defendant Hartman, being Nos. 1,139,969 and 1,139,970, dated May 18, 1915, these patents establish a presumption of non-infringement and right in favor of the defendants. As was said by the Circuit Court in Powell v. Leicester Mills Co., 103 Fed. 476, 'Where a patent has been issued for the alleged infringement device, used by a defendant, he is entitled to the benefit of the presumption arising from such fact, that his device does not infringe the prior patent.' In determining whether defendants' apparatus embodies new and independent invention, not subject to the patents in suit, certain fundamental matters must be considered. The defendants' apparatus

in question relates to the art of purifying water by an electric current, particularly such as are inserted in the local supply line for a building, its action being intermittent as the water is drawn from time to time for drinking purposes. An example of this use of the apparatus of the defendant installed in the Western Theological Seminary of Pittsburgh, being the one upon which this charge of infringement is based.

"There is no doubt that the fundamental electric action in the defendants' apparatus is the same as that in the patents in suit, but this is equally true of every apparatus of the kind in the prior art. The evidence, particularly of Professor Ganz, elaborates the electrolytic methods of treating water. Very generally, it consists of passing the water between electrodes and passing an electric current through the water from one electrode to the other. In one method, not commercial, the electrodes are of some soluble material, such as carbon, which results in the production of gases only—oxygen and hydrogen, but no salts. There is also produced with the oxygen some ozone. The method depending upon the oxygen with the small amount of ozone present, destroying by oxidation the organic matter and bacteria in the water. Another, more practical, method is to use metallic, either aluminum, or iron, electrodes, which form upon electrolysis, salts, which are converted into coagulant material, entraining the impurities, which are then filtered out. In this method, in addition to the salts, some gas is produced, its amount, relative to the amount of salt produced, depending largely upon the voltage of the circuit, a relatively high voltage producing a large amount of gas, and a low voltage little gas and no salts. All the foregoing is fundamental to an electric water purifying apparatus, generally. No claim can be made thereto at this late day by any one, nor can any one infringe any existing patent by making use of such an electrolytic action; for instance, in the patent of Webster granted in 1889, No. 398,101, the single claim of the patent specified, 'The process herein described for purifying sewage and other impure water, which consists in passing the same in contact with electrically excited positive and negative electrodes of iron, whereby salts of iron are produced at the positive electrode, which, in re-acting with the alkalis produced at the negative electrode, form a flocculent, precipitate of ferrous hydrated oxide, which, together with the gases generated, effect the precipitation of the solid matter and the purification of the impurities held in solution.'

"Looking at defendants' apparatus with these principles in mind, we find a fundamental difference between the apparatus of the Hartman patents in suit and the defendants' apparatus. This is shown by the accompanying illustration comprising two views, one an interior view of the 'coagulation chamber' of the defendants' apparatus, which is the important feature in defendants' patents 1,139,969 and 1,139,970, under which they are operating. The other shows an interior view of the 'ozoning chamber,' or pipe, of the patents in suit. From the testimony of Hartman, it appears that he found the latter unsatisfactory and abandoned it, adopting the new and more efficient coagulation chamber of defendants' patents. The chamber in each case is that part of the apparatus which receives the electrically treated water directly from the electrode box. In the ozoning chamber the water enters at the bottom of the pipe and passes freely and unhindered through the pipe or chamber, and out at the top to the filter, giving little opportunity for the salts to form a coagulant, nor for any coagulant to be removed by sedimentation, because everything is carried over from the ozoning chamber to the filter. During the period when water is not being drawn, of course any suspended matter in the chamber when the waterflow ceases, will settle at the bottom of the chamber. But when water is drawn again, all of this temporarily arrested matter will again be carried along and deposited on the filter bed. It is quite the reverse in defendants' coagulation chamber, which comprises a long cylinder having a relatively large cross-section, compared with that of the supply pipe. There the treated water enters the chamber near the top. The outlet pipe enters the chamber from its top, and extends to a point about one-third away from the bottom of the chamber. As the treated water, with the entrained salts and gases, enters the chamber, the gases rise to the top and are drawn off with the water into the pipe to the first filter through a small

hole in the outlet pipe at the top, and within, the coagulation chamber. Thus the gases do not pass through the body of water in the chamber, as is the case in plaintiffs' apparatus. The salts coagulate any organic matter in the water, and owing to the quiescent state of the water the heavier parts of this material fall as a sediment to the bottom of the chamber, where it is removed periodically through an outlet controlled valve into a waste pipe. This avoids fouling and clogging of the filter, making it unnecessary to continually clean it, as was necessary in the apparatus using the ozoning pipe or chamber.

"In plaintiffs' patent 943,188, the claims relied on are 1, 2, 6, 7 and 8, and each of these includes as an indispensable part of the apparatus, means for periodically reversing the current; and in addition, claim 8 requires a chamber through which the liquid is passed in such manner that 'the entrained free oxygen is given time to act on the impurities of the liquid.' I have heretofore considered the construction of the defendants' 'coagulation chamber' as compared with the 'ozoning chamber' of the plaintiffs' apparatus, and the action of the gases in those chambers respectively. Neither of these features is included in defendants' apparatus. The evidence clearly shows in harmony with the wording of the patent, that the invention of the patents in suit is necessarily addressed solely to the use of the direct current, and it is direct current only that requires a reversing mechanism to carry out the purpose and intent of this patent, in order to keep the plates clean. An alternating current when used, requires no such mechanism. And although exceedingly inefficient, such current is used in the defendants' apparatus at the Western Theological Seminary. The evidence shows that in installations requiring a large machine, where alternating current only is available, the defendants supply their customers as a part of the equipment, a motor generator, set to convert the alternating current into a direct current. They also supply a hand reversing switch, such as is shown in Fig. 2 of the Lemp & Koedding patent, which antedates all the Hartman patents involved and is owned and controlled by the defendants. If the hand reversing switch is used in accordance with directions furnished, the switch would be thrown at definite periods of time, having no reference to the amount of the liquid flow, as, for instance, once every day or every other day, causing the current to flow successively in opposite directions. But clearly, this operation does not and cannot assure substantially equal quantities of current flow in opposite directions, as on one day much current may be used and on the next day little or perhaps none at all. I therefore conclude that the claims of the patent in question are definitely limited to a combination requiring an automatic current reversing mechanism within the apparatus as a part thereof, and which current reversing mechanism is of such construction and operation as 'to maintain the current in both directions for substantially equal periods of time during the flow of the liquid, thereby passing substantially equal quantities of current in each direction through the impure liquid.' That otherwise, these claims would be invalid, in view of the Lemp & Koedding patent showing both a hand switch for occasional reversing of current, and an automatic current reversing device; and in view of the patent to Boucher, No. 760,302, showing an automatic current reversing device, which is an embodiment of the invention of Hartman in the patent in question, with the exception of the provision of a definite means whereby the current may be maintained to flow in both directions for substantially equal periods of time during the liquid flow. Considering the fact that the defendants' apparatus in suit uses an alternating current, which requires no current reverser of any kind, and in view of the prior art and the limitations which that art imposes, I do not think any of the claims of patent No. 943,188 are infringed by the defendants' device.

"As to the second principal feature of plaintiffs' invention, namely, the delayed action in the opening of the electric switch in order to prolong the electrical treatment of the water after the flow is cut off, involved in patents Nos. 951,311, 951,312, and 951,313, while patent 951,311 relates to a method or process of purifying water, the same necessary element, namely, the delayed action of the electrical switch, is a requirement of the claims relied on in all three of said patents. All of the eight claims of 951,311 depend for their validity upon this specified feature and requirement of making and breaking the

electric circuit when starting and stopping the flow of liquid, and in a manner to maintain the current flow appreciably longer than the liquid flow.

"And so claims 1 to 8 inclusive, relied on in 951,313, are limited to the feature of retarding the breaking of the circuit until after the liquid flow ceases. The special means employed for carrying out that operation are covered specifically in claims 4, 6, 15 and 16, relied on in patent 951,312. This last named patent is for a control valve mechanism, comprising a valve and electric switch. The particular feature of construction for accomplishing the delayed action therein described, is the provision of a piston and a valve as separate members, which are connected to each other in such manner as to cause the valve to be set before the piston has completed its downward stroke and has opened the electric circuit. The limitations of these claims by the Patent Office were accepted by the patentee in order to secure the patent: and the owner of the patents is estopped from setting up any other construction that would not include such limitations. Hubbell v. United States, 179 U. S. 77, 21 Sup. Ct. 24, 45 L. Ed. 95. Claims 4, 6, 16 require a valve and a movable member or piston which are separate and distinct parts and have a connection between them for the purpose of obtaining the long delay in the opening of the switch, after the liquid flow ceases, as contemplated by the patent; while claim 15 is likewise limited to the feature of a valve 'and connections whereby said circuit controller maintains the circuit closed until after the valve is closed.' Thus it will be seen that an essential of this patent is a separate valve and a separate plunger and, as expressed in the claims involved, 'connections whereby the delayed action is made possible.' The defendants' apparatus does not have a separate valve and plunger, and has no provision for a delayed action or for a retarded movement, or means operative after the current flow ceases, for breaking the circuit. Defendants employ an electrical snap switch, which opens and closes as quickly as is practicable for a mechanical device of this character to operate, and is connected directly with the single piston or plunger of the valve mechanism, and commences to operate instantly when the faucet is turned off. A demonstration in open Court of the operation of the two devices showed that there was a time delay of about thirty seconds between the closing of the valve to cut off the water, and the opening of the electric switch to break the electrical circuit, in the plaintiffs' device; while in the defendants' device this delay was less than one second, and there appeared to be only the time element involved in the normal, mechanical movement of a snap switch.

"It is well established that it is not enough to support the charge of infringement that a defendant has accomplished the same purpose as the patentee, or that he has used some of the elements recited in the claims of the patent. He must have accomplished the same purpose by substantially the same means, and each element of the claim must be represented in the infringing device, performing substantially the same office in the same relationship. Under all the facts of the case, I think plaintiffs have failed to establish their charge of infringement, and the bill must therefore be dismissed at the plaintiffs' cost."

It will be observed from the opinion of the learned trial judge as well as from a careful reading of the claims of the patents that the only matters here seriously in dispute are the method for automatically and periodically reversing the electric current after a predetermined quantity of water has passed and the method and means for maintaining the flow of the current appreciably longer than the flow of the water. These constitute the essence of the several inventions; all other features are subsidiary and of minor importance.

The infringement charged to the defendants is twofold: First, the use of an alternating current, that is, a current that reverses from the negative to the positive electrode one hundred and twenty times a second; and, second, the use of a hand manipulated switch in an ap-

paratus in which direct current is employed. In the first method practiced by the defendants, current reversal is effected by the very character of current used, and, in the second, it is effected by a hand applied mechanism which is controlled not by the quantity of water that passes, but by the memory and hand of a human operator. Current reversal automatically controlled by water volume is the invention, and as the defendants do not employ this control, we think they do not infringe.

With respect to the delay in opening the electric switch and breaking the current after the waterflow has ceased, disclosed in the remaining method and apparatus patents, the patentee very clearly claims as an element of his invention that during this period of time electrolytic action is continued on the arrested water. "The method of purifying liquids consisting in causing the liquid to flow between electrodes containing aluminum and there subjecting the same to the action of an electric current and breaking the electric current when starting and stopping the flow of liquid and in a manner to maintain the current flow appreciably longer than the liquid flow" is the language of a typical claim. In a word, the lag is, as appears by the specification, purposely made and by appropriate mechanism is given a function, measured by seconds (15 to 27). By this function the electrolytic action on the water is allowed to continue after the flow of water has stopped, so that when the flow is resumed, the water which initially leaves the pipe will have been previously purified. In the defendants' apparatus, between the shutting off of the water and the breaking of the current, there is a delay, a lapse of time, or a lag, similarly measured by seconds, but reduced in number from 15 to 27 in the plaintiffs' apparatus to from 1 to 3 in the defendants.' No function is claimed for this delay or lag, so far as we have been shown, and none is performed during this very brief period, so far as we can conjecture from the teachings of the art set out in the briefs and elaborated in the argument. This delay, it is testified —and it so appears to us—is a mere unintentional and functionless incident which is as nearly instantaneous as mechanism involving the shutting off of the current by a snap switch will permit. Were the break in the current actually instantaneous with the break in the waterflow, there would be no lag, and hence no infringement. If the lag of one second, or of one and one-half seconds, in the defendants' apparatus permits nothing to be done different from that which would be done in an instantaneous breaking of the current, then the lag in the defendants' apparatus is functionless, and, manifestly, the defendants do not infringe. As the time delay in the defendants' apparatus appears to lack a duration that suggests any function, and being unable readily to find in the record evidence bearing on the presence or absence of a function in the lag of the defendants' mechanism similar to the function in the lag of the method and apparatus of the patents in suit, we asked counsel to file supplemental briefs on the subject, for, manifestly, if no function was shown, no infringement was proved. Supplemental briefs have been filed, and it is very plain, not only from what they show and fail to show, but from our

own very careful search of the record, that there is in the case no evidence indicating even remotely that in the lag of the defendants' apparatus there is the function of the lag in the plaintiffs', nor is there found in the lag of the defendants' apparatus any element of the theory involved in the lag of the invention of the patents. For lack of testimony on the subject, if for no other reason, we find that the defendants have not infringed.

The decree below is affirmed.